## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| SUZANNE H. WOOTEN | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **CIVIL ACTION NO. 4:18-cv-00380** |
| | § | |
| JOHN ROACH, SR., CHRISTOPHER | § | |
| MILNER, COLLIN COUNTY, TEXAS, | § | |
| GREGORY ABBOTT, AND HARRY | § | |
| EUGENE WHITE | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Suzanne H. Wooten, (hereinafter referred to as "Judge Wooten" or "Plaintiff"), who brings this action pursuant to 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343, and the Fourth and Fourteenth Amendments to the United States Constitution, to vindicate her right to be free from wrongful arrest and prosecution, and files this, her Second Amended Complaint, complaining of and about John Roach, Sr., Christopher Milner, Collin County, Texas, Gregory Abbott, and Harry White (hereinafter collectively referred to as "Defendants"), and for cause of action would show the Court as follows:

### INTRODUCTION

1.      Plaintiff, Suzanne H. Wooten, was wrongfully arrested, charged, and convicted of multiple contrived counts of Bribery, Conspiracy to Commit Engaging in Organized Criminal Activity, Money Laundering, and Tampering with a Governmental Record, based upon false and legally untenable allegations.

2.     Defendants John Roach, Sr., Christopher Milner, Collin County, Texas, Gregory Abbott, and Harry White conspired to wrongfully obtain an indictment and prosecute Plaintiff by inventing and perverting law, misleading judges and juries, and taking apart Plaintiff's life and career one piece at a time.

3.     Beyond the fact that Plaintiff did not engage in the conduct alleged by Defendants, Defendants knew full well that the law did not proscribe any of the alleged conduct. In an attempt to ensure that Plaintiff was convicted despite her innocence, and knowing she committed no criminal act, Defendants intentionally misrepresented the law and facts and secured a wrongful conviction of Plaintiff.

4.     Plaintiff was forced to step down from her judicial position, her license to practice law was suspended for 10 years by the State Bar of Texas Board of Disciplinary Appeals (compulsory action due to convictions), and her reputation and career were devastated. All for the sake of political retribution for defeating the incumbent judicial candidate who preceded Plaintiff on the bench and for not playing ball with the powers that be.

5.     Ultimately, the criminal case against Plaintiff fell apart when the Texas Court of Criminal Appeals held that her alleged co-conspirators were actually innocent and that there was no evidence of any wrongdoing. On May 24, 2017, after spending five and a half years under community supervision, Plaintiff was exonerated by Writ of Actual Innocence.  Unfortunately, the damage had already been done. As noted in the Order granting the Writ of Actual Innocence, Plaintiff's civil rights have been violated. Plaintiff now sues to recover for the harm done to her by the corrupt government agents who targeted her unjustly.

# I.
## JURISDICTION AND VENUE

6.     Venue is proper in the Sherman Division, Eastern District of Texas as all actions of which Plaintiff complains occurred in Collin County, Texas.

7.     Subject matter jurisdiction for this cause rests with this Honorable Court as the case involves violations of the United States Constitution and other federal law.

8.     *In personam* jurisdiction is satisfied as to Defendant Collin County because it is a governmental entity and therefore resides in Texas and/or transacts business in the State of Texas, such that this Court's exercise of personal jurisdiction over the Defendant is consistent with all applicable statutory requirements and constitutional guarantees.

9.     *In personam* jurisdiction is satisfied as to Defendants John Roach, Sr., Christopher Milner, Gregory Abbott, and Harry White because they reside in Texas and/or transact business in the State of Texas, such that this Court's exercise of personal jurisdiction over the Defendants is consistent with all applicable statutory requirements and constitutional guarantees.

# II.
## PARTIES AND SERVICE

10.     Plaintiff, Suzanne H. Wooten, is a resident of Collin County, Texas and the former presiding judge for the 380th Judicial District Court in Collin County, Texas. Judge Wooten may only be contacted through her counsel.

11.     Defendant Collin County is a political subdivision of the State of Texas. Collin County has made an appearance in this case.

12.     Defendant, John Roach, Sr., (in his individual capacity and individually referred to as "Defendant Roach"), was the District Attorney of Collin County during the relevant period for this lawsuit. Defendant Roach has been sued individually for his actions undertaken while in the

course and scope of his employment as the District Attorney for Collin County and while acting under the color of state law. Defendant Roach has made an appearance in this case.

13.     Defendant, Christopher Milner (in his individual capacity and individually referred to as "Defendant Milner"), was an Assistant District Attorney in the Collin County District Attorney's Office during the relevant period for this lawsuit. Defendant Milner has been sued individually for his actions undertaken while in the course and scope of his employment with the Collin County District Attorney's Office and while acting under the color of state law. Defendant Milner has made an appearance in this case.

14.     Defendant, Gregory Abbott, (in his individual capacity and individually referred to as "Defendant Abbott"), served as Attorney General for the State of Texas during the relevant period for this lawsuit. Defendant Abbott has been sued individually for his actions undertaken while in the course and scope of his employment with the State of Texas and while acting under the color of state law. Defendant Abbott has made an appearance in this case.

15.     Defendant, Harry White (in his individual capacity and individually referred to as "Defendant White"), was an Assistant Attorney General for the State of Texas during the relevant period for this lawsuit. Defendant White has been sued individually for his actions undertaken while in the course and scope of his employment with the Office of the Attorney General for the State of Texas and the Collin County District Attorney's Office, and while acting under the color of state law. Defendant White has made an appearance in this case.

## III.
## FACTS

16.     On March 4, 2008, Plaintiff, Suzanne Wooten, defeated the incumbent Judge Charles Sandoval in the Republican primary election for the 380th District Court Judge in Collin County, Texas.  In the history of Collin County, Texas, an incumbent district judge had not been challenged for re-election until Plaintiff won the primary by a landslide.  Judge Wooten's term began January 1, 2009.

17.     The following day, Judge Sandoval went to the Collin County District Attorney's Office (CCDAO) to complain about Judge Wooten. Judge Sandoval felt there was no way Judge Wooten could have won the Republican primary election without cheating, insinuating to the CCDAO that they needed to find a crime.

18.     Thereafter, in 2008 and prior to Judge Wooten taking the bench, the CCDAO decided to conduct its own investigation into Judge Wooten's campaign and began grand jury proceedings to aid in their investigation.

19.     Law enforcement did not initiate this investigation, nor did law enforcement aid in this investigation. This investigation originated and was subsequently conducted by the CCDAO and, later, by the Office of the Attorney General (OAG) acting in conjunction with the CCDAO. The investigation lasted over two years before Judge Wooten was initially indicted on October 14, 2010. Another nine months passed before the final indictment against Judge Wooten was filed on July 14, 2011.

20.     This case involved three other co-defendants. Two of the co-defendants were a married couple named David Frederick Cary and Stacy Stine Cary (Collectively "the Carys"). The third co-defendant was James Stephen Spencer (Spencer), a consultant who assisted the Carys with other matters and was employed by Judge Wooten as her media consultant during her judicial

campaign. Each of the indictments for the Carys, Spencer, and Judge Wooten is substantially identical as the allegations track the same statutory language and same alleged scheme of conduct.

21.     When the indictment against her was handed down, Judge Wooten was attending a judicial conference in California. Upon hearing of the indictment and the intention of the CCDAO and the OAG to arrest her at the airport in front of the media, Judge Wooten promptly returned to Texas and surrendered at the Grayson County jail (due to safety concerns involved in surrendering at a jail where defendants whom Judge Wooten had sentenced were located). Judge Wooten was processed (thoroughly frisked, fingerprinted, and a mugshot taken) and released on a personal recognizance bond.  Although no force was employed because Judge Wooten surrendered, her arrest was not based on probable cause that any crime had been committed and was wholly unconstitutional.

22.     The CCDAO and the OAG moved forward with a prosecution of Judge Wooten knowing there was no probable cause and that a crime had not been committed. After years of "investigation", the eventual theory of prosecution was that the Carys gave itemized monetary contributions to Judge Wooten, through Judge Wooten's media consultant, Spencer, in exchange for Judge Wooten's decision to proceed with a campaign to unseat the incumbent judge of the 380th Judicial District Court. The problem with this theory of prosecution is that, even if true, these actions would not be illegal – and the CCDAO and OAG knew that these alleged actions would not be illegal when they moved forward with the prosecution.

23.     The CCDAO had ulterior malicious political motivations for investigating, arresting, and prosecuting Judge Wooten. The CCDAO wanted Judge Wooten off the bench for reasons including that the CCDAO disagreed with Judge Wooten's rulings in criminal cases. This motivation is evident from a myriad of evidence including, a CCDAO internal email and the

redaction of incriminating statements before dissemination of that email as a response to a public information request, the pressuring of witnesses, destruction of evidence, and the clear misuse and abuse of the grand jury process. Additionally, it was widely known in the legal community that the CCDAO had a Special Crimes Division headed by Defendant Milner who used heavy-handed tactics and strategies to investigate, intimidate, and often overcharge when indicting those who were his perceived enemies.   As detailed below, numerous lawyers, elected officials, and courthouse staffers were targeted by CCDAO during the two terms former District Attorney Roach ran the CCDAO and employed Defendant Milner.[1]   The OAG knowingly aided the CCDAO in accomplishing their goals by way of investigating and prosecuting Judge Wooten when it was clear that no crime had occurred.

24.    After Judge Wooten was unconstitutionally convicted at trial, she was exonerated through the granting of her 11.072 Writ of Habeas Corpus Declaring Actual Innocence as a Matter of Law in the 366th Judicial District Court in Collin County, Texas on May 24, 2017, with the convictions deemed void *ab initio* by the District Court.  The Court relied upon the Court of Criminal Appeals rulings in *Stacy Stine Cary v. State*, 507 S.W.3d 750 (Tex. Crim. App. 2016) and in *David Cary v. State*, 507 S.W.3d 761 (Tex. Crim. App. 2016), that the allegations in the indictments, even if true, were not crimes under Texas law as a matter of law.

25.    As a result of this baseless investigation, prosecution, and conviction, Judge Wooten was forced out of her position as duly-elected judge of the 380th Judicial District Court, exactly as the CCDAO and OAG planned.[2]

---

[1] District Attorney Roach managed and directed the actions of the assistant district attorneys working under him. Attorney Pro Tem White managed and directed the actions of the assistant district attorneys working under him.

[2] Additional repercussions include the following:

26.     This action is brought pursuant to 42 U.S.C. § 1983, the United States Constitution, Texas Constitution, Texas statutes, and common law.

**Office of the Attorney General Involvement**

27.     At the time of the CCDAO's and the OAG's investigation and prosecution of Judge Wooten, Gregory Abbott was the Attorney General of Texas.

28.     In December of 2008, CCDAO Chief of Special Crimes Unit Chris Milner requested the assistance of the Criminal Prosecution Division of the Office of the Attorney General of Texas in investigating a case against Judge Wooten. According to Defendant White, Defendant Milner requested Defendant White because Defendant Milner had experience working with Defendant White on previous occasions and Defendant White had "expertise" prosecuting election

---

- The criminal history resulting from the wrongful conviction severely limited Judge Wooten's employment opportunities. Judge Wooten could not even rent commercial space to operate a mediation practice because of the criminal history.
- Judge Wooten's mediation practice was impacted because lawyers were reluctant to use her.
- Judge Wooten's husband had to take a job in Houston beginning from 2012 through 2015 so that they would not lose the family home.  Judge Wooten and her husband could not sell their home and rent an apartment because of her criminal history.
- Judge Wooten could not pick up her husband from DFW Airport without a travel permit because part of the airport is in Tarrant County which is not contiguous to Collin County.
- When her mother-in-law was placed in hospice, Judge Wooten could not see her before she died because she could not obtain a travel permit in time.  Thus, Judge Wooten's husband was alone when his mother passed away.
- Judge Wooten was prohibited from attending school activities (field trips, etc.) at all of her children's schools because of her criminal history. She missed years of her children's activities and events.
- When her mother had a stroke and was in the hospital, Judge Wooten could not see her because she could not obtain a travel permit in time.
- At least one of her children experienced bullying and had to change to a school in another city.
- Judge Wooten's judicial portrait was removed from the courthouse wall and thrown in the garbage behind the courthouse.
- Judge Wooten's judicial history has been erased from the Collin County District Clerk's electronic records.
- The stress created by the circumstances she was forced to endure has impacted her physical and emotional health, including nightmares and stress related hives.
- Judge Wooten's Judicial Commission Records still note online that she was suspended and convicted, and the commission is apparently unable to correct the records.

---

violations. Defendant Abbott, the OAG, allowed his office and staff, including Defendant White, to assist the CCDAO in the pro-longed investigation into Judge Wooten.

29.    The OAG had additional/greater resources than the CCDAO and was able to provide Attorney General Auditor Kyle Swihart along with Defendant White. Defendant White would be assisting the CCDAO as a Special Assistant District Attorney, while the CCDAO would maintain control of the investigation.

30.    In an interview with FBI investigators in mid-July of 2010, Defendant White confirmed that he became involved in the investigation of Judge Wooten in December of 2008 (prior to Judge Wooten taking the bench) and stated to the FBI that he did not know why the CCDAO did not recuse themselves at the beginning of the Judge Wooten investigation. Defendant White misrepresented to the FBI that he had been appointed the Attorney Pro Tem *in February of 2010*. Further, Defendant White informed the FBI that CCDAO thought that once Greg Willis was elected Collin County District Attorney, the "Wooten investigation would be discontinued if not transferred to the AG's office". The involvement of the Attorney General's Office was further confirmed by John R. Roach, Sr., the then District Attorney of Collin County, Texas, in a <u>Texas Lawyer</u> article dated July 14, 2010, wherein Roach is quoted as saying, "Mr. White operates under my authority but not my direction…"  It will become clear that the CCDAO wanted to maintain control over the malicious investigation and prosecution of Judge Wooten under the guise of the OAG leading the charge.

31.    On July 22, 2010, eight (8) days after the FBI met with Defendant White, Defendant Milner and Defendant Roach requested that the Office of the Attorney General and its designee (Defendant White) become the Attorney *Pro Tem* for the Judge Wooten investigation.[3] The Order

---

[3] Although Defendant White has been held to be absolutely immune for certain wrongful conduct following his appointment as Attorney Pro Tem on July 22, 2010, the actions taken are relevant to the liability of the

of Recusal and Appointing Attorney Pro Tem signed by Judge Mark Rusch on July 22, 2010, included a provision that the CCDAO may "render such non-prosecutorial support, investigative aid and other assistance as the Attorney Pro Tem deems proper".  This would appear to give control of the investigation to the OAG. However, Defendant White had been working as a Special Assistant District Attorney with the CCDAO since December of 2008 and was formally "deputized" as an Assistant District Attorney for Collin County in September of 2009 when this "changing of the guard" occurred on paper in July of 2010.

32.    On July 28, 2011, the Defendant White/OAG's Office provided to Judge Wooten's Counsel a 48-page underlined redacted copy of an FBI report.  In a pre-trial hearing on July 29, 2011, Defendant Harry White admitted on the record that the FBI report was redacted by the Attorney General's Office, not the FBI, prior to its submission to Judge Wooten's counsel on July 28, 2011. In the hearing on July 29, 2011, Defendant White represented to the Court that he and/or the Attorney General's office had redacted portions of the report that they did not believe were "relevant."  At that hearing, the Court ordered White to produce the FBI report to Judge Wooten's Counsel, unredacted.

33.    On August 1, 2011, Judge Wooten's Counsel discovered approximately 35 additional pages from the FBI Report that the Attorney General's Office had received when they provided the redacted 48-page report to Judge Wooten's Counsel on July 28, 2011.  Most of the approximate 35 pages were summaries of the investigation by the FBI and correspondence with the United States Attorney's Office.  In the documents, Judge Suzanne Wooten was listed as the "victim" with the suspects listed as Defendant John R. Roach, Gregory Davis, former First

---

CCDAO under the Monell cause of action in this case, because as Attorney Pro Tem, Defendant White's actions represent the policies of the CCDAO and were taken in furtherance of those policies. Furthermore, the wrongful conduct of Defendant White following his appointment as Attorney Pro Tem goes to the failure to supervise and failure to intervene causes of action against Defendant Abbott.

Assistant District Attorney for the CCDAO and Defendant Christopher Milner.  After a review of the unredacted FBI report, it was clear that the FBI report contained information that was exculpatory and revealed information about Defendants' conduct.

34.     Defendant Abbott knowingly permitted the conduct described above and/or he failed to intervene when the investigation in which his office was continuing to be a party was clearly unconstitutional, illegal, and without merit.

**Abuse of the Grand Jury Process**

35.     In September of 2008, the first known grand jury subpoena was issued as a result of a criminal investigation against Judge Wooten, before Judge Wooten took the bench in January of 2009.  At least 9 grand jury subpoenas for documents were issued in the Fall of 2008 alone.

36.     In September 2009, Defendant Milner started issuing grand jury subpoenas for Judge Wooten's employees, numerous people who contributed funds to Judge Wooten's campaign, and other persons related to the campaign.

37.     The CCDAO used at least six grand juries to investigate this criminal case against Judge Wooten. More specifically, the grand juries of the Fall of 2008, Spring of 2009, Fall of 2009, Spring of 2010, Fall of 2010, and Fall of 2011. Four of the six grand juries were used to subpoena bank records, phone records, credit card documents, personal records, emails, and various campaign-related vendor information. Three of the six grand juries were used to subpoena witnesses.

38.     District Judge Chris Oldner presided over one of the grand juries (Fall of 2009). That grand jury wrote a letter to Judge Oldner explaining that they felt the cases presented to them by the CCDAO and OAG involving two elected officials (including Judge Wooten) were politically motivated, a waste of tax payers' dollars, and that no crimes had been committed. The

final version of the letter was not sealed and became public knowledge shortly thereafter.  It was well known that this grand jury was used in the investigation of Judge Wooten, however, references to Judge Wooten were removed and/or intentionally omitted from the final version of the letter so that the illegitimate "investigation" of Judge Wooten could continue.

39.     In April of 2010, the Federal Bureau of Investigation (FBI) began investigating three attorneys in the CCDAO: District Attorney John Roach, First Assistant District Attorney Greg Davis, and Chief of Special Crimes Unit Assistant District Attorney Chris Milner, for allegations that the CCDAO was misusing the grand jury to create politically motivated investigations against Judge Wooten and Collin County District Attorney candidate Greg Willis (a former Collin County Judge).

40.     The FBI investigation involved numerous interviews. One of those interviews was with grand jury member, D.J.,[4] who was on the Fall of 2009 grand jury that heard the Wooten and Willis investigations. According to D.J., Assistant District Attorney (ADA) Paul Anfosso usually presented the cases to the grand jury. The exceptions were usually cases involving crimes against children in which the specific ADA assigned to the case made the presentations. There were two exceptions. These exceptions were articulated as being the District Attorney's (DA's) top two cases and were presented by ADA's Davis and Defendant Milner. The cases involved Collin County Judges Greg Willis and Judge Wooten.

41.     D.J. stated that the two cases against Judge Greg Willis and Judge Wooten were completely different from all the other cases heard by the grand jury. The presentation of evidence for the two cases was strange. The prosecutors, Davis and Defendant Milner, often set the stage for a witness by telling the grand jury what the witnesses would testify about. The prosecutors

---

[4] The name of this individual who served on the grand jury is being withheld to protect their identity.

often made comments to both D.J. individually and to the grand jury as a whole, which led D.J. to believe both cases may have had underlying personal issues.

42.     D.J. described the cases against Judge Wooten and Judge Greg Willis as being needlessly drug out, as no serious evidence was ever presented, even though prosecutors kept promising that a "star witness" would arrive who would make sense of all of it. These two cases were handled totally different from other cases, which moved along more rapidly.

43.     D.J. and other grand jury members started articulating to Davis and Defendant Milner their concerns as to the DA's Office having conflicts of interest with these cases. D.J. told the prosecutors that the investigation seemed more like a political witch-hunt. D.J. asked Davis if his boss (CCDA John Roach) knew what the prosecutors were doing. Davis responded that of course Roach knew, that was why they were presenting the cases, and that Roach did not like this person (Judge Greg Willis). After that comment, Davis tried to backtrack and told D.J. to forget that D.J. heard that comment.

44.     Defendant Milner kept promising that the grand jury would hear from a "star witness." This never happened. Defendant Milner kept bringing in DA office employees whose testimonies added nothing new to what had already been presented. He seemed to be dragging out the investigation. D.J. surmised that it was all politically motivated.

45.     The grand Jury asked Defendant Milner for them to vote on Judge Wooten's criminal case, but Defendant Milner refused to present the case to the grand jury for a vote. This was done because in the event the grand jury no-billed Judge Wooten, Defendant Milner would have had to provide substantial evidence to reopen the case. By not formally presenting the case to the grand Jury before its term ended, Defendant Milner could just continue investigating Judge Wooten when the next grand jury's term began. Defendant Milner was grand jury shopping.

46.     On June 24, 2010, the Collin County grand jury (CCGJ) voted eight to three in favor of a 90-day extension to their six-month term. Collin County District Judge Ray Wheless was presiding over the grand jury at that time. Judge Wheless denied the grand jury the 90-day extension because he felt the Attorney General (OAG) prosecutor (Defendant White) was working on behalf of the CCDAO and not the OAG.

47.     Despite Judge Wheless denying the extension of the Spring 2010 Grand Jury, on June 28, 2010, Defendant White contacted both of Judge Wooten's defense counsel and requested that Judge Wooten appear at an *added* Grand Jury session to be held on June 30, 2010.   Judge Wooten and her counsel offered to and did meet with Defendant White, Brian Chandler (another Assistant Attorney General) and Kyle Swihart on June 29, 2010.   Judge Wooten had set aside 3 hours of her docket to accommodate the meeting.   The meeting was not lengthy and when Judge Wooten and her counsel asked Defendant White and his team if they had any questions for Judge Wooten, they stated that they did not and the meeting ended.   Judge Wooten perceived the purpose of the meeting as an attempt to intimidate her.

48.     Thereafter, based upon Judge Wooten's information that Judge Wheless' Grand Jury had been dismissed, Judge Wooten's counsel filed a Motion to Quash Illegally Re-Assembled Grand Jury on June 29, 2010.   A hearing on the motion was held on June 30, 2010, with Judge Wooten's attorney and Defendant White appearing at the hearing.   Judge Wheless granted the Motion to Quash and found that, "The Attorneys representing the State in this matter had absolute (sic) NO authority to re-assemble this Court's Grand Jury after it was discharged on June 24, 2010 without permission of the Court….Therefore, there is no authority for this Court's Grand Jury to re-assemble to conduct any additional business.   Any such business will be VOID and have NO

AUTHORITY.  Any person who violates this order will immediately be held in CONTEMPT" (no emphasis added).

49.     Prior to the indictments, Collin County District Judge Chris Oldner (presiding Grand Jury Judge of the Fall 2009 Grand Jury referenced herein) admitted to Judge Wooten and Collin County District Judge Mark Rusch that he (Judge Oldner) had two separate meetings with Davis and Defendant Milner regarding the substance of their investigations against Judge Wooten and Judge Greg Willis. Judge Oldner informed them that he did not believe that Davis and Defendant Milner had presented information that warranted an investigation against Judge Wooten or Judge Greg Willis. Defendant Milner and Davis' responses were that they would eventually gather enough information to indict Judge Wooten and Judge Greg Willis. They just needed more time to investigate.

50.     Prior to Defendant Milner being employed at the CCDAO, grand jury investigations were initiated by law enforcement organizations. There were no independent investigations initiated and conducted by the CCDAO. However, when Defendant Milner started his employment with the CCDAO, the Special Crimes Unit was formed, and grand jury cases began to be initiated from within the Special Crimes Unit.

**Abuse of Power for Political Gain by CCDAO and OAG Members**

51.     Rumors of the CCDAO investigation were wide-spread at the courthouse starting in mid-2009 and Defendant Milner would often sit in the back of Judge Wooten's courtroom watching her when he had no case on her docket. Judge Wooten perceived this behavior as an attempt to intimidate her because she had heard that the CCDAO did not like her rulings in criminal cases.  Judge Wooten's financial matters with her long-time banking institution started changing

in mid-2009 based upon its receipt of grand jury subpoenas for her personal financial records and persons unknown to Judge Wooten were seen to drive by and photograph her home and family.

52.     Defendant Milner and Judge Rusch had a close relationship. Judge Rusch told Judge Wooten that Defendant Milner informed him (Judge Rusch) about details of the Judge Wooten and Judge Greg Willis grand jury investigations. Defendant Milner explained to Judge Rusch that he wanted to leave the CCDAO with a bang. Judge Rusch had mentioned to Judge Wooten that Defendant Milner was looking to prosecute Dallas District Attorney Craig Watkins on a constable investigation. Further, Judge Rusch told Judge Wooten not to worry about Judge Sandoval, but to worry about the "army" coming after her.  At that time, Judge Wooten was not aware that Judge Rusch was referring to the Attorney General's Office.

53.     On October 1, 2009, Judge Wooten's attorney, Peter Schulte (Schulte) contacted Defendant Milner regarding the CCDAO investigation of Judge Wooten.  Defendant Milner demanded that Schulte meet with him pronto.  Schulte met with Defendant Milner in the Collin County Courthouse and in that meeting, Defendant Milner told Schulte that Judge Wooten had one week to resign, or she was going to be facing indictment and would lose her home, law license, her family, her reputation, and that he would put her in prison for a long time.  When Schulte inquired about the basis for Judge Wooten resigning, Defendant Milner replied that "she knows what she did" and that the "Judge" (Defendant Roach insisted that he be called Judge Roach) would look favorably upon her if she resigned.  Judge Wooten declined Defendant Milner's demand and continued her duties as a sitting District Judge.

54.     A meeting took place between Defendant Milner and Spencer. During this meeting, Defendant Milner asked Spencer to sign a blank confession. Defendant Milner explained that he

would tell Spencer what he was going to say in the confession after Spencer signed it. Spencer declined to sign the blank confession.

55.     CCDAO Investigator Steve Goodman passed on information that evidence pertaining to the Judge Wooten and Greg Willis investigations was being destroyed within the CCDAO.[5]

56.     On September 21, 2009, Schulte issued a public information request to the CCDAO for any communication the CCDAO had regarding policies and procedures when presenting cases in Judge Wooten's court. On December 16, 2009, the CCDAO responded to Schulte's request with a copy of an internal email from Davis to ADA Ben Smith and CCDA Roach, which contained a brief paragraph congratulating Smith and ADA Linda Kirklen for their work on a mortgage fraud trial.

57.     Schulte subsequently obtained an additional copy of what appeared to be the same email, but with additional paragraphs in which Davis stated to only conduct a Trial Before Court (TBC) in Judge Wooten and Judge Jill Willis' courts if the ADA's did not have any interest in the outcome of the case and a TBC was the only way to reasonably dispose of the case. The initial email Schulte received was redacted in efforts to hide the fact that the CCDAO did not want Schulte to know of the policies and procedures in Judge Wooten and Judge Jill Willis courts. This supported the rumors that the CCDAO did not like the rulings Judge Wooten was making in criminal cases.

---

[5] Mr. Goodman has since claimed in an interview with the FBI to be unaware of any destruction of evidence.

58.     On August 28, 2010, the FBI investigation into the CCDAO ended after Defendant White told FBI investigators that the CCDAO had a legitimate investigation[6] against Judge Wooten and that the OAG expected to receive a grand jury indictment in the near future.

**Pattern of Similar Conduct by the CCDAO**

59.     A pattern of abuse of power and malicious prosecution for political gain plagued the CCDAO. In the time surrounding the gross misuse of the law against Judge Wooten, there has accumulated multiple examples of similar abusive conduct, including but not limited to the following:

- Collin County Judge Greg Willis was investigated by Defendant Milner and Assistant Attorney General David Glickler while Greg Willis was a candidate for the Collin County District Attorney position that would be vacated by Roach. Judge Greg Willis' case was not indicted by the grand jury convened by Defendant Milner.

- Denton County Sheriff Weldon Lucas was indicted by Defendant Milner a day after the Sheriff's election. The indictment against Sheriff Lucas was thrown out by a judge just over one week later.

- Dallas County Sheriff Jim Bowles was indicted by Defendant Milner for allegedly funneling more than $100,000 in political contributions into his personal accounts. The indictment was thrown out by a judge. The provision of the Texas Election Code used by Defendant Milner does not even specify criminal penalties for the alleged violations.

---

[6] Based on timesheets obtained from the OAG, Defendant White was personally conducting investigation activities as late as at least October 2011.

- Dallas County Jail Commissary Vendor Jack Madera was indicted by Defendant Milner only to have the indictment dropped.

- J.V.[7] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.  Upon information and belief, Defendant Milner specifically targeted J.V. because of a personal vendetta.

- D.W.[8] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.

- In similar fashion as the present allegations, an investigation and prosecution of Robert Rodriguez was conducted by the CCDAO (without police involvement) for theft and misappropriation of fiduciary property. The investigation was initiated at the urging of Scott Ginsburg, a major campaign contributor to then District Attorney Roach. The investigation was conducted by Milner, in the shadowy "special crimes" division of the CCDAO. An indictment was obtained based on false, incomplete, and misleading information. Again, no investigation was conducted by the police. Rodriguez was ultimately acquitted when a jury found him not guilty of the criminal charges brought by the CCDAO.

**Post-Indictment Procedural History**

60.     In addition to filing Motions to Disqualify the Attorney Pro Tem, including a motion to remove the Attorney Pro Tem filed by District Attorney Greg Willis, Judge Wooten

---

[7] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

[8] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by this wrongful conduct.

filed a number of Motions to Quash the Indictment.  One of the Motions to Quash the Indictment was filed on January 25, 2011.

61.     On March 11, 2011, in a hearing on that Motion to Quash, presiding (visiting) Judge Kerry Russell denied the Motion and stated in part that the "State can charge anyone under any section they want" and ignored the Legislature's intent of preventing this type of indictment against candidates and elected officials.

62.     In July of 2011, an offer was relayed to Judge Wooten's attorneys on behalf of the County that if she resigned, agreed to never run for public office again, and agreed to plead guilty to a misdemeanor election code violation, the entire indictment would be dismissed. Judge Wooten's re-election would have been in March of 2012. Judge Wooten again declined the offer and shortly thereafter, a "re-indictment" was obtained adding the charge of money laundering, *inter alia.*

63.     Judge Wooten, along with the other alleged co-conspirators, was charged by indictment ("re-indictment") on July 14, 2011, for six counts of Bribery, one count of Engaging in Organized Criminal Activity, one count of Money Laundering, and one count of Tampering with a Governmental Record.

64.     Judge Wooten's trial was held first. Stacy Cary's trial was held second, Spencer's trial was held third, and David Cary's trial was held last.

65.     Judge Wooten, Stacy Cary, and David Cary were each convicted by different juries. Seeing no chance of receiving a fair trial and the widespread publicity the case had garnered, Spencer opted to take a plea deal and was sentenced to probation. David Cary received 14 years confinement, serving 19 months of such sentence in a prison gang unit before his release, and Stacy Cary was placed on probation.

66.     As a result of the conviction, Judge Wooten was placed on probation for ten years, forced to step down from her judicial position, and her license to practice law was suspended for 10 years by the State Bar of Texas Board of Disciplinary Appeals.[9]

67.     Judge Wooten's conviction and probation also resulted in her being deprived of her right to possess a firearm, her right to vote, her ability to serve on a jury, and her right to run for elected office.

68.     Judge Wooten also suffered serious financial losses related to the wrongful investigation and conviction and the reputational damage inflicted upon her, including but not limited to the loss of income and benefits related to losing her judicial position and her inability to practice law, her financial institutions and insurers terminating her accounts, and her credit being severely impaired. Judge Wooten also incurred legal expenses in defending against the wrongful investigation and prosecution that stretched on for years.

---

[9] Additionally, Judge Wooten was required to do the following:

1. Waive her right to appeal and her right to file a motion for new trial.
2. Submit to detailed interviews and answer very personal and private questions, including questions about her life, her family, drugs, alcohol, if she had been involved in criminal activity, and, her emotional state.
3. Provide a DNA sample and have her information and identity entered into a national criminal data base.
4. Pay a $10,000.00 fine and $236.00 in court costs.
5. Restrict movement to Collin County, Texas, unless obtaining a written travel permit.
6. Participated in a psychological evaluation, at her cost.
7. Take an anti-theft course, at her cost.
8. Take a lengthy "Cognitive Learning" course, at her cost.
9. Participate in Treatment Alternatives to Incarceration Program by submitting to a substance abuse evaluation, at her cost.
10. Abstain completely from consuming alcohol, in any form.
11. Perform 1,080 hours of community service.
12. Permit probation officers to visit her home or work whenever they wanted.
13. Report to probation once per month.
14. Pay probation fees of $50.00 per month.
15. Pay Crime Stopper fee of $50.00.
16. Submit to random drug screening, at her cost, beginning 2011 until probation ended. The drug testing required Judge Wooten to permit a worker at the drug screening facility to closely watch her urinate into a cup over the toilet.

---

PLAINTIFF'S THIRD AMENDED COMPLAINT

69.     Beyond the deprivation of her civil rights and the financial and reputational impact suffered as a result of Defendants' gross misconduct, Judge Wooten and her family suffered the mental anguish and emotional distress associated with being terrorized and hunted for years by the most powerful individuals in state and local law enforcement.[10]

70.     The Carys were able to directly appeal their cases. Stacy Cary's case was appealed first.  The Dallas 5th District Court of Appeals affirmed Stacy Cary's conviction. *See, Stacy Cary v. State,* 05-12- 01421-CR, 2014 WL 4261233 (Tex.App. - Dallas 2015). However, in his lengthy dissenting opinion, Justice Kerry P. Fitzgerald offered a scathing dissent, stating that "with respect to the bribery charges at the heart of this case, this case is most unusual because the State's evidence is not merely insufficient - if affirmatively negates an essential element of the bribery charges and *proves appellant not guilty." Id.* at page 1, Dissenting Opinion (Tex.App. -Dallas 2014)". Further, Justice Fitzgerald confirmed that all the other counts of the indictment would fail in their entirety as a result.

71.     Several months later, a unanimous panel of the Dallas 5th District Court of Appeals reversed the convictions of David Cary and rendered acquittals on all counts, finding that there "was insufficient evidence to support his convictions" on all counts (emphasis added). *See, David Cary v. State,* 460 S.W.3d 731 (Tex.App. - Dallas 2015).

72.     The State in the David Cary case and Stacy Cary case (the OAG) filed a Petition for Discretionary Review (PDR) with the Court of Criminal Appeals. The Court of Criminal Appeals granted PDR on each case and heard the cases in tandem.

73.     On December 14, 2016, the Court of Criminal Appeals handed down their unanimous opinions in both David and Stacy Cary's cases.

---

[10] Judge Wooten was required as a condition of probation to be psychologically evaluated. The evaluation determined she had moderate to severe Post Traumatic Stress Disorder.

74.     In David Cary's case, the Court of Criminal Appeals affirmed the 5th District Dallas Court of Appeals opinion and affirmed the acquittal on all counts. *See, David Cary v. State,* PD-0445-15 (Tex. Crim. App. 2016).

75.     In Stacy Cary's case, the Court of Criminal Appeals reversed the opinion of the 5th District Dallas Court of Appeals and rendered acquittals on all counts as well. *See, Stacy Cary v. State,* PD-1341-14 (Tex. Crim. App. 2016).

76.     In both cases, the Court of Criminal Appeals stated that there was "insufficient evidence to support [all of their] convictions." *Id.*

**The failure to supervise or intervene**

77.     Defendants Abbott, White, Roach and Milner each acted in supervisory roles over various subordinates doing their bidding. Defendant Roach was the Collin County District Attorney, supervising Defendant Milner and other members of the CCDAO in the investigation and prosecution of Judge Wooten.  Defendant Milner acted in a supervisory role over those under his control in the investigation of Judge Wooten. Defendant White, acting as Attorney Pro Tem filled the same role as Defendant Roach once he took over the investigation and prosecution of Judge Wooten. Defendant Abbott likewise supervised Defendant White, as Defendant White's superior, and had the power to intervene and direct Defendant White's actions and those operating under him. Indeed, Defendant Abbott assigned White to assist and later assume the investigation and prosecution of Judge Wooten.[11]

78.     Defendants failed to adequately supervise those under their control, allowing an investigation, arrest, and prosecution to go forward without probable cause of any crime

---

[11] The failure to supervise and failure to intervene would be related to the administrative activities of the Defendants, and not subject to any claim of prosecutorial immunity.

---

having been committed. In particular, Defendant Abbott failed to intervene to stop his subordinate, Defendant White, from pursuing an illegal investigation and prosecution. Defendant White failed to intervene to stop the CCDAO from pursuing the wrongful investigation and prosecution of Judge Wooten, when it was clear from the beginning that no crime had been committed. Even following extensive investigation, which failed to identify any crime, Defendant White failed to intervene to stop the wrongdoing by the CCDAO. Instead, Defendant White assumed the reins of a corrupt investigation and prosecution and continued it unabated. Defendant Abbott, being Defendant White's superior and the individual responsible for assigning Defendant White failed to adequately supervise him and failed to intervene to stop the improper and illegal investigation and prosecution of Judge Wooten.

**Judge Wooten is Acquitted/Exonerated of Each and Every Allegation Contained in the Indictment**

79.     On May 10, 2017, Judge Wooten filed her First Amended Application for 11.072 Writ of Habeas Corpus Declaring Actual Innocence as a Matter of Law with the 366th Judicial District Court in Collin County, Texas.

80.     On May 24, 2017, the Court granted Judge Wooten's requested relief finding that the Texas Court of Criminal Appeals, in its decisions in *Stacy Stine Cary v. State*, 507 S.W.3d 750 (Tex. Crim. App. 2016) and in *David Cary v. State*, 507 S.W.3d 761 (Tex. Crim. App. 2016), acquitted those co-defendants on all counts (which were substantially identical to the charges against Judge Wooten), finding the evidence presented legally insufficient because the allegations, even if true, were not crimes under Texas law. The Court found that those Opinions by the highest criminal court in the State of Texas were directly relevant to Judge Wooten's case and required the Court to GRANT the relief Judge Wooten requested, as a matter of law.

81.     The Court further found that, in light of *Stacy Stine Cary v. State*, 507 S.W.3d 750 (Tex. Crim. App. 2016) and in *David Cary v. State*, 507 S.W.3d 761 (Tex. Crim. App. 2016), the evidence presented at Judge Wooten's trial was legally insufficient to convict her of the following nine (9) felony convictions: one (1) count of Conspiracy to Commit Engaging in Organized Criminal Activity, six (6) counts of Bribery, one (1) count of Money Laundering, and one (1) count of Tampering with a Governmental Record with Intent to Defraud/Harm.

82.     ***The trial court found a violation of Judge Wooten's due process rights.***

Pursuant to the 416th District Court's rulings on May 24, 2017, Judge Thompson affirmatively found that Plaintiff's due process rights were violated.  A portion of the Court's orders read as follows:

> Criminal Activity, six (6) counts of Bribery, one (1) count of Money Laundering, and one (1) count of Tampering with a Governmental Record with Intent to Defraud/Harm. The Court therefore FINDS a violation of Applicant's due process rights.
>
> Order on First Amended 11.072 Writ of Habeas Corpus, 366-81639-2011

# IV.
## Count I – 42 U.S.C. § 1983
## Violation of Procedural Due Process Rights

83.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

84.     As described more fully above, all of the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional rights, in that she was he was deprived of a life, liberty, or property interest without the process that was due. Saucedo-Falls v. Kunkle, 299 Fed. Appx. 315, 319 (5th Cir. 2008).  Indeed, a judicial finding has been made that the arrest and prosecution of

Plaintiff violated her right to due process. Exhibit A, Order, attached hereto and incorporated herein by reference.

85.     In the manner described more fully above, the Defendants conducted a reckless criminal investigation, knowingly arresting Plaintiff without probable cause and pursued a criminal prosecution of Plaintiff for alleged conduct that was not criminal and based upon "facts" they knew were untrue. Anderson v. Maggio, 555 F.2d 447, 452 (5th Cir. 1977) (recognizing a conviction in the absence of evidence that a crime was committed results in a violation of due process.). Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued. Moreover, the Defendants continued the prosecution of Plaintiff after they knew, or should have known, that Plaintiff had committed no criminal act.

86.     Defendants' misconduct directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of her rights under the United States Constitution.

87.     As a result of the violation of Plaintiff's procedural due process rights, Plaintiff suffered injuries, including but not limited to financial harm and emotional distress. Additionally, Plaintiff had liberty interests which were unconstitutionally restricted by being placed on probation for ten years, including but not limited to all of the prohibitions and limitations related to the extensive terms of probation for the 10-year period, and restricted travel beyond Collin County and the contiguous counties.

88.     Additionally, Plaintiff was deprived of the constitutionally protected rights in various property interests, such as the property interest in continued employment and maintaining a professional license.[12]

---

[12] See Porter v. Valdez, 424 Fed. Appx. 382, 388-89 (5th Cir. 2011) (citing Schaper v. City of Huntsville, 813 F.2d 709, 717 (5th Cir.1987)); Barnett v. City of Plainview, 848 S.W.2d 334, 339 (Tex. App.–Amarillo 1993, no writ) (holding judge in was not at-will employee, where state statute expressly provided for minimum term of service); Bowlby v. City of Aberdeen, Miss., 681 F.3d 215, 220 (5th Cir. 2012)

89.     As a result of her wrongful and illegal conviction, Plaintiff was as deprived of the following protected rights:

a.  Plaintiff's Second Amendment right to keep and bear arms, according to Texas Penal Code Sec 46.04, Texas Government Code §411.172-a-3, and 18 U.S.C. 922(g).

b.  Plaintiff was disenfranchised and deprived of her right to participate in the political process because individuals in Texas convicted of a felony are ineligible to vote while on probation according to Section 11.002 of the Texas Election Code.

c.  Plaintiff was barred from serving on a jury according to Section 62.102 of the Texas Government Code,

d.  Plaintiff was deprived of her right to participate in the political process because she was barred from running for public elective office according to Section 141.001 of the Texas Election Code.

90.     The misconduct described in this Count was objectively unreasonable, as no government official would have acted in such a manner, and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

91.     The misconduct described in this Count was undertaken by employees and agents of the Collin County, including but not limited to Defendants, pursuant to the policy and practices of Collin County to pursue wrongful arrests and convictions through profoundly flawed investigations and false allegations. In this way, Collin County violated Plaintiff's rights by

---

("Privileges, licenses, certificates, and franchises ... qualify as property interests for purposes of procedural due process.") (citing Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586 (1971)).

maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

92.     These widespread practices, so well settled as to constitute *de facto* policy of Collin County, were able to exist and thrive because the policymaker(s)[13] with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

93.     The widespread practices described in the preceding paragraphs were allowed to flourish because Collin County failed to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

94.     As a result of the Defendants' unconstitutional conduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

### Count II – 42 U.S.C. § 1983
### Violation of Fourth Amendment

95.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

96.     As described more fully above, all of the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of the clearly established and well-settled constitutional right protected by the Fourth Amendment to U.S. Constitution to be free from unreasonable searches and seizures, including unlawful detention and arrest.

97.     In particular, Defendants arrested, seized and detained Plaintiff without probable cause. When the indictment was handed down Judge Wooten surrendered at the Grayson County jail (due to safety concerns involved in surrendering at a jail where defendants whom Judge Wooten had sentenced were located). Judge Wooten was processed and released on a personal

---

[13] The policymakers at issue in this case were Defendant Roach and Defendant White.

recognizance bond. Although no force was employed because Judge Wooten surrendered, her arrest, seizure and custodial detention was not based on probable cause that any crime had been committed and was wholly unconstitutional.

98.     In the manner described more fully above, the Defendants conducted a malicious criminal investigation, knowingly arresting Plaintiff without probable cause and pursued a criminal prosecution of Plaintiff for alleged conduct that was not criminal and based upon "facts" they knew were untrue. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued. Moreover, the Defendants continued the prosecution of Plaintiff after they knew, or should have known, that Plaintiff had committed no criminal act.

99.     Defendants' misconduct directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of her rights under the United States Constitution.

100.     As a result of the Defendants' violation of her constitutional rights, Plaintiff suffered injuries, including but not limited to the deprivation of her freedom while held in custody, restraint on her freedom while under probation and bond, financial harm, and emotional distress.

101.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

102.     The misconduct described in this Count was undertaken by employees and agents of Collin County, including but not limited to Defendants, pursuant to the policy and practices of Collin County to pursue wrongful arrests and convictions through profoundly flawed investigations and false allegations. In this way, the Collin County violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

103. These widespread practices, so well settled as to constitute *de facto* policy of Collin County, were able to exist and thrive because policymaker(s) with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

104. The widespread practices described in the preceding paragraphs were allowed to flourish because Collin County failed to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

105. As a result of the Defendants' unconstitutional conduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

**Count III – 42 U.S.C. § 1983**
**Supervisory Liability**

106. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

107. The constitutional injuries complained-of herein were proximately caused by a pattern and practice of misconduct which occurred with the knowledge and consent of Defendants Abbott, White, Roach, and Milner, who acted in a supervisory capacity, such that these Defendants personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or else affirmatively turned a blind eye thereto without taking any steps to stop it.

108. Plaintiff pursues supervisory liability claims based upon the allegations that these Defendants acted, or failed to act, with deliberate indifference to violations of Plaintiff's constitutional rights committed by their subordinates.

109. In this way, these Defendants are personally responsible for the complained-of injuries because they knowingly, willfully, or at least recklessly caused the alleged deprivation of Plaintiff's civil rights by their actions or by their deliberately indifferent failure to act.

110. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others. The failure to supervise would be related to the

administrative or managerial activities of the Defendants, and not subject to any claim of prosecutorial immunity.

111.    The misconduct described in this Count[14] was undertaken, at least in part, pursuant to Collin County's policies and practices in the manner more fully described above.

112.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including financial harm, and emotional pain and suffering.

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene

113.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

114.    Defendants Abbott, White, Roach, and Milner had a reasonable opportunity, had they been so inclined, to prevent another Defendant from violating Plaintiff's rights in the manner described above, but they failed to do so.

115.    Plaintiff pursues failure to intervene claims based upon the allegations that these Defendants acted, or failed to act, with deliberate indifference to violations of Plaintiff's constitutional rights committed by their subordinates.

116.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights. The failure to intervene would be related to the administrative or managerial activities of the Defendants, and not subject to any claim of prosecutorial immunity.

117.    The misconduct described in this Count[15] was undertaken, at least in part, pursuant to Collin County's policies and practices in the manner more fully described above.

---

[14] See supra paragraphs 77-78.

[15] See supra paragraphs 77-78.

---

118.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

## Count V – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

119.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

120.    Defendants Abbott, White, Roach, and Milner (the "Individual Defendants") reached an agreement amongst themselves to wrongfully investigate, arrest and prosecute Plaintiff for false and legally untenable claims of Bribery, Conspiracy to Commit Engaging in Organized Criminal Activity, Money Laundering, and Tampering with a Governmental Record, and to thereby deprive Plaintiff of her constitutional rights, all as described in the various paragraphs of this Complaint.

121.    In this manner, Defendants, acting in concert with other unknown co-conspirators, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

122.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

123.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

124.    The misconduct described in this Count was undertaken, at least in part, pursuant to Collin County's policies and practices in the manner more fully described above.

125.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

126.    This Count is only brought against the Individual Defendants in their individual capacities and is not brought against any governmental entity or any of the individuals in their official capacities.

### Count VI – 42 U.S.C. § 1983
### Malicious Prosecution

127.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

128.    The Individual Defendants caused Plaintiff to be improperly subjected to arrest and criminal prosecution for which there was no legitimate probable cause. Judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor with a judicial finding of actual innocence.

129.    The Individual Defendants accused Plaintiff of criminal activities knowing those accusations to be without genuine probable cause and without support in the law, and they made statements to judges and juries with the intent of exerting influence to institute and continue the judicial proceedings.  Such conduct violated Plaintiff's constitutional protections provided by the Fourth and Fourteenth Amendments to the U.S. Constitution.

130.    Statements the Individual Defendants made regarding Plaintiff's alleged culpability were made with the knowledge that said statements were false. The Individual Defendants withheld the facts of their manipulation from Plaintiff.

131.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

132.    As a result of this misconduct, Plaintiff sustained and continues to sustain injuries including financial harm, and emotional pain and suffering. This Count is only brought against the Individual Defendants in their individual capacities and is not brought against any governmental entity or any of the individuals in their official capacities.

### Count VII –
### Abuse of Process

133.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

---

PLAINTIFF'S THIRD AMENDED COMPLAINT

134.    The Individual Defendants made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process.

135.    The Individual Defendants had an ulterior motive or purpose in exercising such illegal, improper, or perverted use of the process. As a result of the Individual Defendants' misconduct, Plaintiff sustained, and continues to sustain, injuries including financial harm, and emotional pain and suffering.

136.    This Count is only brought against the Individual Defendants in their individual capacities and is not brought against any governmental entity or any of the individuals in their official capacities.

### Count VIII – 42 U.S.C. § 1983
### Violation of Substantive Due Process Rights

137.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

138.    As described more fully above, all of the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her substantive due process rights, in that she was deprived of a life, liberty, or property interest in an arbitrary and capricious manner. Saucedo-Falls v. Kunkle, 299 Fed. Appx. 315, 319 (5th Cir. 2008).[16]

---

[16] "One form of 'substantive' due process is the substantive protections in the Bill of Rights that have been 'incorporated' into the Fourteenth Amendment to limit the power of the states." Kovac v. Wray, 3:18-CV-0110-L, 2019 WL 1057935, at *15 (N.D. Tex. Mar. 5, 2019) (citing McDonald v. City of Chicago, Ill., 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Scalia, J., concurring)). Additionally, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (internal citations omitted). A liberty interest includes that which is, "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258 (1997).

139.     Plaintiff had liberty interests which were unconstitutionally restricted by being placed on probation for ten years, including but not limited to all of the prohibitions and limitations related to the extensive terms of probation for the 10-year period, and restricted travel beyond Collin County and the contiguous counties.

140.     Additionally, Plaintiff was deprived of the constitutionally protected substantive due process rights in various property interests, such as the property interest in continued employment and maintaining a professional license.[17]

141.     As a result of her wrongful and illegal conviction, Plaintiff was as deprived of the following protected rights:

a.       Plaintiff's Second Amendment right to keep and bear arms, according to Texas Government Code §411.172-a-3 and 18 U.S.C. 922(g).

b.       Plaintiff was deprived of her right to participate in the political process and disenfranchised because individuals in Texas convicted of a felony are ineligible to vote while on probation according to Section 11.002 of the Texas Election Code.

c.       Plaintiff was barred from serving on a jury according to Section 62.102 of the Texas Government Code.

d.       Plaintiff was deprived of her right to participate in the political process because she barred from running for public elective office according to Section 141.001 of the Texas Election Code.

---

[17] See Porter v. Valdez, 424 Fed. Appx. 382, 388-89 (5th Cir. 2011) (citing Schaper v. City of Huntsville, 813 F.2d 709, 717 (5th Cir.1987)); Barnett v. City of Plainview, 848 S.W.2d 334, 339 (Tex. App.–Amarillo 1993, no writ) (holding judge in was not at-will employee, where state statute expressly provided for minimum term of service); Bowlby v. City of Aberdeen, Miss., 681 F.3d 215, 220 (5th Cir. 2012) ("Privileges, licenses, certificates, and franchises ... qualify as property interests for purposes of procedural due process.") (citing Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586 (1971)).

142.    All the above rights were clearly established well before their violation by Defendants. The rights were stripped away from Plaintiff, and such represent violations of her substantive due process rights.

### Count IX –
### 42 U.S.C. § 1983
### *Monell* Liability of Collin County

143.    Collin County had a policy of pursing wrongful investigations, arrests, and prosecutions without probable cause and without due process.  The policymakers in relation to the wrongful investigations, arrests, and prosecutions pursued without probable cause and without due process, were Collin County District Attorney John Roach, Sr. and Collin County Attorney Pro Tem Harry White.

144.    A pattern of similar incidents of abusive investigations, arrests, and prosecutions plagued Collin County during the relevant periods of this lawsuit. Indeed, multiple examples of abusive conduct accumulated under the reign of District Attorney Roach, including the following:

- Collin County Judge Greg Willis was investigated by Defendant Milner while he was a candidate for the Collin County District Attorney position that would be vacated by Defendant Roach. Judge Greg Willis' case was not indicted by the grand jury convened by Defendant Milner and the David Glickler.

- Denton County Sheriff Weldon Lucas was indicted by Defendant Milner a day after the Sheriff's election. The indictment against Sheriff Lucas was thrown out by a judge just over one week later.

- Dallas County Sheriff Jim Bowles was indicted by Defendant Milner for allegedly funneling more than $100,000 in political contributions into his personal accounts. The indictment was thrown out by a judge. The provision of the Texas Election

Code used by Defendant Milner does not even specify criminal penalties for the alleged violations.

- Dallas County Jail Commissary Vendor Jack Madera was indicted by Defendant Milner only to have the indictment dropped.

- J.V.[18] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.

- D.W.[19] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.

- In similar fashion as the present allegations, an investigation and prosecution of Robert Rodriguez was conducted by the CCDAO (without police involvement) for theft and misappropriation of fiduciary property. The investigation was initiated at the urging of Scott Ginsburg, a major campaign contributor to then District Attorney Roach. The investigation was conducted by Milner, in the shadowy "special crimes" division of the CCDAO. An indictment was obtained based on false, incomplete, and misleading information. Again, no investigation was conducted by the police. Rodriguez was ultimately acquitted when a jury found him not guilty of the criminal charges brought by the CCDAO.

145.    The constitutional violations in this case were the direct result of the policy, custom and practice and general atmosphere within the CCDAO in which political arrests and prosecutions were pursued with zeal and without consequence.

---

[18] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

[19] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

146.    The policy of the CCDAO of targeting citizens and elected officials without probable cause to believe they had engaged in any unlawful conduct was the moving force behind the violation of Plaintiff's constitutional rights.

147.    Indeed, the "Special Crimes Division" appears to be little more than a division used by Roach to harass and intimidate political and personal foes, or to do so on behalf of his political donors and allies.   The use of the "Special Crimes Division" in such fashion shows a pattern, custom, and practice amounting to a policy of the CCDAO of exacting political revenge on behalf of District Attorney Roach and his allies by way of unfounded investigations and prosecutions.

148.    It is particularly important to note the CCDAO was fully aware that Plaintiff had not violated any law. Yet, the CCDAO conducted a lengthy sham investigation, initiated an arrest, and pursued prosecution of Plaintiff. In doing so, the CCDAO ratified the wrongful acts of its employees, agents, and representatives involved in this case.

149.    The policy, custom, and practice of Collin County was to execute, encourage and/or ratify the arrest and prosecution of individuals and elected officials in Collin County without probable cause and without providing due process. These practices were common and widespread so as to constitute a custom that fairly represents the policy of the Collin County.

150.    At the time of the incident, Defendants John Roach, Sr., Defendant Christopher Milner, and Defendant Harry White were acting pursuant to a custom, policy, practice and/or procedure of the CCDAO. For years, as depicted in countless media accounts, the CCDAO had a custom and culture of political prosecutions. Defendants' actions constitute a violation of 42 U.S.C. § 1983 and of Plaintiff's clearly established and well-settled rights to be free from unlawful searches, seizures, and prosecutions, as protected by the Fourth and Fourteen Amendments to the U.S. Constitution.

151.    Plaintiff would show that Defendant Collin County is liable because a pattern, practice or policy of constitutional violations existed that led to the violation of Plaintiff's constitutional rights. At the time of Plaintiff's wrongful arrest and prosecution, there was a widespread practice in the CCDAO of abusing prosecutorial powers. The practice was so widespread as to constitute the policy and custom of the Collin County itself.

152.    The CCDAO had, during the relevant time period of this complaint, an informal custom, practice or policy regarding the wrongful arrest and prosecution of individuals without probable cause of unlawful conduct and without due process.

153.    The above practices, policies, and customs constituted deliberate indifference towards Plaintiff's constitutional rights. The violation of her constitutionally protected rights (including those protected by the Fourth and Fourteenth Amendments) was a direct and foreseeable cause of her injuries. As a result, Plaintiff is entitled to recover actual damages as a matter of law. The practices, policies and customs were the moving forces behind the constitutional violations that resulted in the injury of Plaintiff.

## V.
## NO ABSOLUTE OR QUALIFIED IMMUNITY

154.    It is anticipated Defendants will raise, or attempt to raise, a defense of absolute immunity. In this regard, Plaintiff points out that Defendants' conduct fell outside the actions "intimately associated with the judicial phase of the criminal process" and as such are not afforded absolute prosecutorial immunity.[20] *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see Burge v. Parish of St. Tammany*, 187 F.3d 452, 478 (5th Cir. 1999) (prosecutor acting as investigator not

---

[20] The Court has held in this case that Defendant White is absolutely immune as to certain limited allegations occurring after July 22, 2010, and Plaintiff does not pursue such allegations against Defendant White. However, Plaintiff continues to assert those allegations to the extent applicable to claims against the other Defendants.

entitled to absolute immunity). "A prosecutor has no absolute immunity for legal advice given to the police, nor for administrative duties or investigatory functions that do not relate to an advocate's preparation to initiate prosecution or further judicial proceedings." Brown v. City of Houston, 297 F. Supp. 3d 748 (S.D. Tex. 2017), reconsideration denied sub nom. Brown v. City of Houston, Texas, CV H-17-1749, 2018 WL 1333883 (S.D. Tex. Mar. 15, 2018). The U.S. Supreme Court has explained:

> A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

Buckley v. Fitzsimmons, 509 U.S. 259, 276, 113 S. Ct. 2606, 2617, 125 L. Ed. 2d 209 (1993). Consequently, Defendants are not entitled to absolute immunity.[21]

155.    Additionally, Plaintiff pleads that it is clearly established law that every citizen of the United States has a clearly defined constitutional right to be free from an unlawful seizure by law enforcement officials in accordance with the Fourth Amendment to the United States Constitution, as applied to the several States through the Fourteenth Amendment, and are entitled to due process of law under the Fifth Amendment to the United States Constitution, as applied to the several States through the Fourteenth Amendment.  No reasonable government official or agent would have acted as Defendants did under the circumstances of this case, by investigating, arresting, and prosecuting Plaintiff without probable cause and without providing due process. Consequently, Defendants are not entitled to absolute immunity.

---

[21] Plaintiff maintains that immunity is not available for a prosecutor who initiates and conducts an investigation and procures an indictment for a crime that does not exist.

156.    It is anticipated Defendants will raise, or attempt to raise, a defense of qualified immunity. In this regard, Plaintiff pleads that it is clearly established law that every citizen of the United States has a clearly defined constitutional right to be free from an unlawful seizure by law enforcement officials in accordance with the Fourth Amendment to the United States Constitution, as applied to the several States through the Fourteenth Amendment, and are entitled to due process of law under the Fifth Amendment to the United States Constitution, as applied to the several States through the Fourteenth Amendment.  No reasonable government official or agent would have acted as Defendants did under the circumstances of this case, by investigating, arresting, and prosecuting Plaintiff without probable cause and without providing due process. Consequently, Defendants are not entitled to qualified immunity.

157.    Plaintiff also asserts the ultra vires[22] exception to any assertion of immunity by Defendants. The ultra vires exception to immunity provides that "'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions,' or 'ultra vires his authority,' and thus not protected by sovereign immunity." Def. Distributed v. U.S. Dept. of State, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015), aff'd sub nom. Def. Distributed v. United States Dep't of State, 838 F.3d 451 (5th Cir. 2016) (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)). Under the ultra vires exception, claims may be brought against a government official for nondiscretionary acts unauthorized by law. Such lawsuits are not against the government and thus are not barred by immunity. Government officials act "ultra vires" if they exceed the bounds of their granted authority or if their acts conflict with the law itself. Morgan v. Fed. Bureau of Investigation, A-16-CV-1290-LY, 2017 WL 1322251, at *3 (W.D. Tex. Apr. 10, 2017). Here, in

---

[22] The word 'ultra' means beyond and the word 'vires' means powers.

investigating, arresting, and pursuing a prosecution without probable cause and without providing due process, for alleged conduct that was not illegal, Defendants acted "ultra vires." These actions were taken without any authority and without any colorable basis for the exercise of authority. Def. Distributed, 121 F. Supp. 3d at 690. As such, Defendants are not entitled to immunity for their "ultra vires" conduct.

## VI.
## EXEMPLARY DAMAGES

158.    Plaintiff repeats and re-alleges the allegations contained above as though fully set forth herein.

159.    When viewed objectively from the standpoint of the Individual Defendants, at the all times relevant, said Defendants' conduct involved an intentional, malicious, and extreme conduct calculated to cause great harm to the Plaintiff.

160.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Defendants, Plaintiff is entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court.

## VII.
## DAMAGES FOR PLAINTIFF

161.    Due to the wrongful acts of Defendants, Judge Wooten suffered mental anguish.

162.    Due to the wrongful acts of Defendants, Judge Wooten suffered lost wages and diminished earning capacity.

163.    Due to the wrongful acts of Defendants, Judge Wooten is entitled to punitive damages against the Individual Defendants.

164.    Judge Wooten requests costs of court and expenses, including attorneys' fees.

165.    Judge Wooten requests prejudgment interest.

166.     Judge Wooten requests post judgment interest.

167.     Judge Wooten seeks such other and further relief, general and special, legal and equitable, to which she may show herself justly entitled.

## VIII.
## JURY DEMAND

168.     Plaintiff, Suzanne H. Wooten, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that Defendants John Roach, Sr., Christopher Milner, Collin County, Texas, Gregory Abbott, and Harry White, be cited to appear and answer herein, and that upon a final hearing of the cause, that this Court enter judgment in her favor and against Defendants, awarding compensatory damages, costs, and attorneys' fees as well as punitive damages against each of the Individual Defendants and any other relief this Court deems appropriate

a.     damages in an amount within the jurisdictional limits of this Court;

b.     all damages, penalties, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988, and as otherwise may be allowed by federal law;

c.     pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law;

d.     post-judgment interest at the legal rate;

e.     costs of the Court; and

f.     such other and further relief to which Plaintiff may be entitled at law or equity.

Respectfully submitted,

**SCOTT H. PALMER, P.C.**

/s/ *Scott H. Palmer*
SCOTT H. PALMER
State Bar No. 00797196
JAMES P. ROBERTS
State Bar No. 24105721

15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone:      214.987.4100
Facsimile:      214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded to all counsel of record, in a manner authorized by Rule 5, of the Federal Rules of Civil Procedure, on June 17, 2019.

*/s/Scott H. Palmer*
SCOTT H. PALMER